# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ASPHALT CONTRACTORS INC.,**
       **Plaintiff,**

      **v.**                          **Case No. 21-C-0077**

**R&J TRANSPORT, INC., et al.,**
       **Defendants.**

---

## DECISION AND ORDER

Plaintiff Asphalt Contractors Inc. filed a complaint in the circuit court for Racine County, Wisconsin, against R&J Transport, Inc., and other parties. The suit concerns damage to an expensive piece of Asphalt's machinery that occurred while R&J, a trucking company, was transporting it from Whitewater, Wisconsin, to Lake Geneva, Wisconsin. Asphalt alleges claims for negligence and breach of contract under Wisconsin law. Although the parties are not diverse, R&J and the other defendants removed the case to this court, alleging that Asphalt's claims arise under federal law. Asphalt now moves to remand the case to state court on the ground that its claims, which concern damage to cargo that occurred during intrastate transportation, do not arise under federal law. Relatedly, R&J and its driver move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that Asphalt's state-law claims are preempted by federal law.

## I. BACKGROUND

According to the allegations of the complaint, Asphalt is in the business of paving and asphalt maintenance. In the Spring of 2018, it hired R&J to transport a large piece of equipment known as a Kleemann crusher from Whitewater, Wisconsin to Otto Jacobs

Company, which was located in Lake Geneva, Wisconsin. R&J was required to obtain a permit from the Wisconsin Department of Transportation to complete the trip. The complaint alleges that, although R&J obtained a permit for the trip, it mistakenly listed the destination as Geneva Earth Works (which was also located in Lake Geneva) rather than Otto Jacobs. The permit identified a required route for the driver to take, and it listed the maximum permitted height, width, and length of the cargo.

On the day of the trip, R&J's driver, Leigh Koehler, loaded the crusher onto a lowboy trailer. According to the complaint, Koehler did this improperly, which caused the combined height of the trailer and crusher to exceed the maximum permitted height. On the way to the destination, Koehler drove under a highway overpass with insufficient clearance, which caused the crusher to strike the overpass. The impact caused significant damage to the crusher. Asphalt alleges that, had R&J sought a permit for the correct destination and followed the designated route, the accident would not have occurred because Koehler would have exited the highway before encountering the overpass.

Asphalt commenced the present action by filing a complaint against R&J, Koehler, and R&J's insurers in the circuit court for Racine County, Wisconsin. The complaint alleges five causes of action. First, it alleges that R&J and Koehler were negligent in loading and transporting the crusher. Second, it alleges that R&J was negligent in its hiring, training, and/or supervision of Koehler. Third, it alleges that R&J breached the contract that was formed when Asphalt hired R&J to transport the crusher from Whitewater to Otto Jacobs. Fourth, it alleges an alternative claim against R&J for promissory estoppel. Finally, it alleges claims against R&J's insurers under Wisconsin's direct-action statute, Wis. Stat. § 632.24.

2

After they were served, the defendants, led by R&J, removed the action to this court. Because the parties are not completely diverse, removal was not based on 28 U.S.C. § 1332. Instead, the notice of removal alleges that federal jurisdiction exists under 28 U.S.C. § 1331 and statutes granting district courts jurisdiction over cases involving federal laws regulating interstate commerce. R&J alleges that, although Asphalt's complaint purports to contain only state-law claims for negligence and breach of contract, in fact the complaint must be deemed to arise under federal law. This is so, R&J contends, because Asphalt's claims all boil down to a claim for damage to cargo that occurred during transportation by motor carrier. R&J contends that, in light of the long history of federal regulation (and deregulation) of the motor-carrier industry, a claim for damage to cargo must be deemed to arise under federal law, even if the cargo was damaged during intrastate transportation rather than interstate transportation.

After removing the case, R&J filed a motion to dismiss Asphalt's complaint under Federal Rule of Civil Procedure 12(b)(6). It alleges that Asphalt's state-law claims are preempted by federal law, specifically the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"). According to R&J, the only claim Asphalt could pursue is a claim for damage to cargo under federal common law. This alleged federal common-law claim would be identical to a claim under the Carmack Amendment, which governs claims for damage to cargo that occurs during interstate transportation.

Asphalt opposes R&J's motion to dismiss and moves to remand the case to state court. Asphalt contends that its claims do not arise under federal law because there is no federal cause of action for damage to cargo that occurs during intrastate transportation. Further, Asphalt contends that the FAAAA does not preempt its state-law claims. Asphalt

3

seeks an order awarding it the costs and attorneys' fees it incurred as a result of the removal.

## II. DISCUSSION

I am confronted with both a motion to remand the case to state court and a motion to dismiss the complaint for failure to state a claim upon which relief may be granted. Because the motion to remand raises a challenge to federal subject-matter jurisdiction, I must address it before turning to the motion to dismiss, which pertains to the merits. *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 277–78 (7th Cir. 2020) (jurisdiction is a threshold issue that must be addressed before the merits).

**A.     Motion to Remand**

The federal removal statutes provide that a case must be remanded to state court if the district court lacks subject-matter jurisdiction. 28 U.S.C. § 1447(c). In the present case, R&J contends that jurisdiction is conferred by 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Whether the action "arises under" federal law is determined by the well-pleaded complaint rule, under which federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). "The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Id.*

Important to this case is an aspect of the well-pleaded complaint rule holding that "a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption." *Id.* at 393. Also important is the "independent corollary" to

4

the well-pleaded complaint rule known as the "complete preemption" doctrine. *Id.* The Seventh Circuit has described "complete preemption" as a misnomer. *See Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000). The doctrine has "nothing to do with preemption and everything to do with federal occupation of a field." *Id.* "The name misleads because, when federal law occupies the field (as in labor law), *every* claim arises under federal law." What we call complete preemption simply recognizes that "[a]ny attempt to present a state-law theory . . . is artful pleading to get around the federal ingredient of the claim." *Id.* Where the doctrine applies, "[s]tate law is 'completely preempted' in the sense that it has been replaced by federal law—but this happens because federal law takes over all similar claims, not because there is a preemption defense." *Id.* at 919–20. Only a small number of federal statutes have completely preemptive effect. *Sarauer v. Int'l Ass'n of Machinists*, 966 F.3d 661, 669 (7th Cir. 2020). In fact, to date, the Supreme Court has found only three statutes to result in complete preemption: (1) § 301 of the Labor Management Relations Act, 29 U.S.C. § 185; (2) § 502(a) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a); and (3) §§ 85 and 86 of the National Bank Act, 12 U.S.C. §§ 85, 86. *See Retail Property Trust v. United Bhd. of Carpenters*, 768 F.3d 938, 947–48, 948 n.5 (9th Cir. 2014).

In the present case, R&J contends that the case arises under federal law due to complete preemption. But R&J does not point to a federal statute that any court has deemed to have completely occupied the field of intrastate transportation by motor carrier. Instead, R&J points to the Federal Aviation Administration Authorization Act of 1994, which contains a preemption provision that arguably preempts some or all of the plaintiff's claims. *See* 49 U.S.C. § 14501(c)(1). But this is merely an express preemption provision

5

and, as just discussed, a suit does not arise under federal law simply because the defendant has a valid preemption defense. Nonetheless, R&J contends that complete preemption applies to this case because, in light of the FAAAA's supposed preemption of the plaintiff's state-law claims, the action must be deemed to arise under "federal common law." *See* Notice of Removal ¶ 20. This is a somewhat convoluted argument that, at bottom, rests on R&J's mistaken belief that there is such a thing as a federal common law of intrastate transportation. To explain why this is so, I must first provide an overview of federal regulation and deregulation of common carriers and their relationship to the cases of *Swift v. Tyson*, 41 U.S. 1 (1842) and *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

Before the emergence of statutory regulation, the liability of common carriers was controlled by federal and state common law. *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997) (citing *York Co. v. Central R.R.,* 70 U.S. 107 (1865) and *Hart v. Penn. R.R. Co.*, 112 U.S. 331 (1884)). Importantly, however, the federal component of this common law was not federal common law in the modern sense, which federal courts sometimes apply to protect "uniquely federal interests" or when Congress gives them power to develop substantive law. *See King v. Gibbs*, 876 F.2d 1275, 1282 (7th Cir. 1989). Instead, the federal component was the "general" common law referred to in *Swift v. Tyson*, which held that federal courts sitting in diversity were not bound by state common-law decisions and could apply their own understandings of common-law principles. 41 U.S. at 18–19; *see Adams Express Co. v. Croninger*, 226 U.S. 491, 504 (1913) (recognizing that 19th century federal common law governing carriers was "that of the general common law"); Margaret Tarkington, *Rejecting the Touchstone: Complete Preemption and Congressional Intent after Beneficial National Bank v. Anderson*, 59

6

S.C.L. Rev. 225, 258 n.205 (2008) (noting that, prior to 1906, there was no federal law as to carrier liability other than pre-*Erie* general federal common law). This "general" federal common law existed alongside state common law and applied only when the case was litigated in federal court. If the same case had been litigated in a state court, the state court would have applied its own common law. *See Erie*, 304 U.S. at 74–77 (explaining that "[p]ersistence of state courts in their own opinions on questions of common law prevented uniformity"). In other words, unlike the federal common law that is still applied today, the federal general common law was not part of the laws of the United States and did not fall within the scope of the Constitution's Supremacy Clause. *See Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1153 n.4 (7th Cir. 2001) ("The general common law, unlike the federal common law of today, did not fall under the Supremacy Clause of the United States Constitution.").

*Swift*, of course, was overruled by *Erie*, which held that "[t]here is no federal general common law" and that federal courts sitting in diversity were bound by state decisional law. 304 U.S. at 78. But well before *Erie* was decided in 1938, Congress began to regulate common carriers, and this regulation produced legal principles that were binding on both the state and federal courts. In the Interstate Commerce Act of 1887, Congress first regulated the railroad industry. *See Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016). In 1906, Congress amended the Interstate Commerce Act by passing the Hepburn Act, Pub. L. 59-337, 34 Stat. 584, which contained a provision known as the Carmack Amendment. *See Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1196 (9th Cir. 1999). The Carmack Amendment, as later interpreted by the Supreme Court in *Adams Express v. Croninger*, 226 U.S. 491 (1913), "specified that

7

federal law controlled liability for goods lost or damaged during *interstate* shipments." *Sam L. Majors*, 117 F.3d at 926 (comma omitted, emphasis added). Thus, after the enactment of the Carmack Amendment and the Supreme Court's decision in *Adams Express*, state courts were bound by federal law in matters involving goods that were damaged during interstate shipping. Notably, the states were bound to apply federal law not as a matter of federal common law, but because, under the Supremacy Clause, the Carmack Amendment "supersede[d] all state regulation with reference to" the liability of a carrier for damage to goods during interstate shipment. *Adams Express*, 226 U.S. at 505–06. Still, because the Carmack Amendment applied only to "interstate contracts of shipment," *id.* at 503, states continued to apply their own common law (and statutes) when determining liability for damage to cargo that occurred during intrastate shipment. *See, e.g., Chesapeake & O. Ry. Co. v. Osborne*, 154 Va. 477, 498 (1930) ("The shipment here in question being a Virginia *intrastate* shipment is governed by the statutes and the decisions of the Virginia court."). Further, after *Erie* overruled *Swift v. Tyson*, federal courts began applying state common law when determining a common carrier's liability for damage to cargo during intrastate carriage. *See, e.g., Goliger Trading Co. of N. Y. v. Chicago & N. W. Ry. Co.*, 184 F.2d 876, 879 (7th Cir. 1950) (applying Illinois common law to question of carrier's liability for damage to cargo during intrastate shipment).

Congress began its regulation of the motor carrier industry with the Motor Carrier Act of 1935, Pub. L. 74-255, 49 Stat. 543, which, among other things, subjected motor carriers to the Carmack Amendment. *See Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 334–35 (3d Cir. 2014). Since that time, the liability of a motor carrier for damage to goods during interstate shipment

8

has been determined by federal law. *See N. Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 453–54 (7th Cir. 1996). However, the Motor Carrier Act of 1935 did not regulate intrastate shipping. *See* § 202(c), 49 Stat. at 543; *Tucker v. Cas. Reciprocal Exch.*, 40 F. Supp. 383, 385 (N.D. Ga. 1941). Thus, the liability of a motor carrier for damage to goods during intrastate shipping remained subject to state law.

As the above analysis shows, prior to the 1970s, there was no federal statutory or common law (in the modern sense) that applied to claims alleging damage to cargo in intrastate shipping. During the 1970s, however, Congress began deregulating the transportation industry, and the next question is whether, during deregulation, a federal cause of action for damage during intrastate shipping arose.

Congress began deregulation with the airlines. *See Costello*, 810 F.3d at 1050. In 1978, it passed the Airline Deregulation Act ("ADA"), Pub.L. No. 95–504, 92 Stat. 1705, which "dismantled federal regulation of the airline industry." *Id.* The ADA also contained a preemption provision that expressly preempted any state law "relating to rates, routes, or services" of any air carrier. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378–79 (1992). According to the Supreme Court, Congress included this provision in the ADA "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Id.* at 378.

Congress began deregulating the trucking industry with the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793. *See Costello*, 810 F.3d at 1051. Like the ADA, the Motor Carrier Act ended the federal government's management of the trucking industry. *Id.* However, the Motor Carrier Act did not repeal the Carmack Amendment (which by then had been altered and recodified, *see Kawasaki Kisen Kaisha Ltd. v. Regal-*

9

*Beloit Corp.*, 561 U.S. 89, 107 (2010)) and did not preempt the states' ability to regulate trucking, *see Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 132 (3d Cir. 2018). However, by 1994, Congress had determined that "[s]tate economic regulation of motor carrier operations [had become] a huge problem for national and regional carriers attempting to conduct a standard way of doing business." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440 (2002) (citing H.R. Conf. Rep. No. 103–677, p. 87 (1994), U.S.Code Cong. & Admin.News 1994, pp. 1715, 1759). Congress addressed this concern when it enacted the Federal Aviation Administration Authorization Act of 1994, which expressly preempted certain state regulation of the trucking industry. *Lupin*, 905 F.3d at 132. The preemption provision (which is subject to statutory exceptions) provides in relevant part as follows:

> [A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1). The Supreme Court has recognized that this preemption provision was based on the express preemption provision of the ADA, and it interprets the statutes similarly. *See Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 370 (2008).

Importantly, neither the FAAAA nor any other deregulatory statute purported to bring intrastate shipping within the scope of the Carmack Amendment or to grant a shipper a federal cause of action against a motor carrier for damage to goods occurring during intrastate shipment. And R&J has not cited, and I have not found, any case recognizing either a federal common law of intrastate shipping or a federal cause of action against a common carrier for damage to cargo during intrastate shipping. The only case

10

I have found confirms that there is no such federal cause of action. *See Burkett v. Fox Moving & Storage of Tenn., LLC*, No. 3:10–0933, 2010 WL 5184828, at \*2–3 (M.D. Tenn. Dec. 15, 2010) (remanding claim for damage to property during intrastate transportation by motor carrier to state court).

R&J does cite one case in which a federal court exercised jurisdiction over a claim for damage to goods during intrastate shipment, *Luccio v. UPS, Co.*, No. 9:16-CV-81703-RLR, 2017 WL 412126 (S.D. Fla. Jan. 31, 2017), but that case is not persuasive because it is not based on the existence of a federal cause of action. Instead, the case rests on the court's mistake in thinking that the presence of a preemption defense automatically permits removal. In *Luccio*, the plaintiff brought a claim in state court against UPS for negligence relating to its "handling" of the plaintiff's cryopreserved embryos. *Id.* at \*1. UPS removed the case based on its argument that the FAAAA preempted the claim. *Id.* The plaintiff filed a motion to remand arguing that, because the transportation was intrastate, the FAAAA did not apply. *Id.* at \*2. The district court found that FAAAA preemption applied to both intrastate and interstate shipping, and that therefore the plaintiff's negligence claim was preempted. *Id.* The court determined that because the claim was preempted, federal jurisdiction was proper. *Id.*

Although the *Luccio* court might have been correct in its determination that the FAAAA preempted the plaintiff's negligence claim, the court erred when it concluded that such preemption was sufficient to confer federal jurisdiction. As I discussed above, under the well-pleaded complaint rule, the presence of a federal preemption defense does not confer "arising under" jurisdiction. Thus, the mere fact that the FAAAA preempted the plaintiff's negligence claim did not permit removal. *See Vorhees v. Naper Aero Club, Inc.*,

11

272 F.3d 398, 403 (7th Cir. 2001) (holding that remand was required even though the claims plaintiff was trying to assert "may very well be preempted by" federal law). To properly deem the case removable, the *Luccio* court would have had to have determined that "Congress clearly intended completely to replace state law with federal law and create a federal forum." *Id.* (emphasis added). In other words, the *Luccio* court should have examined whether the FAAAA resulted in complete preemption. But the court overlooked that necessary step of the analysis and instead assumed that FAAAA preemption automatically resulted in federal jurisdiction. Thus, *Luccio* is not persuasive authority as to the existence of a federal cause of action for damage to property during intrastate shipment.

R&J also contends that FAAAA preemption "is the trigger for federal common law" governing a claim for cargo damage during intrastate shipping. Br. in Opp. at 9. Here, it cites cases recognizing a federal common-law claim for cargo loss and damage against air carriers. *See Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 383–84 (7th Cir. 2007); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926–29 (5th Cir. 1997). However, the cases recognizing a federal common-law claim against air carriers do not support the proposition that a similar claim exists in intrastate shipping cases. To explain why this is so, I must return to my discussion of the history of the regulation and deregulation of common carriers.

Congress began regulating air carriers using "a patchwork of statutes" that were enacted in the 1920s and 1930s. *See Sam L. Majors*, 117 F.3d at 926 n.6. In 1938, Congress replaced this patchwork with the Civil Aeronautics Act, Pub. L. 75-706, 52 Stat. 973. *Id.* In 1958, it adopted the Federal Aviation Act ("FAA"), Pub. L. 85-726, 72 Stat. 731,

12

which was "similar in many ways to the other major interstate commerce acts," including the Interstate Commerce Act and the Motor Carrier Act. *Sam L. Majors*, 117 F.3d at 927. Like the other acts, the FAA subjected airlines to regulation by an administrative agency and required them to set uniform rates through a tariff system. *Id.* But unlike the other interstate commerce acts, the FAA did not include a provision that imposed liability on carriers for loss or injury to goods transported, and it did not create a private cause of action based on such liability. *Id.* However, the federal courts determined that when Congress passed the FAA, it intended that federal courts would adjudicate claims for loss or damage to goods transported by air carrier under the federal common law. *Id.* at 927–28 & n.11. Although different courts of appeals offered different rationales for recognizing this federal common-law claim, *see id.* at 927–28 & n.12, the primary rationale was that it would not have made sense for Congress to have, on the one hand, required an airline to charge uniform rates to all shippers but, on the other, allowed the airline's liability for damage to goods to vary based on the state of the shipper. *See N. Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 232–33 (2d Cir. 1978). This was deemed to be so because "[l]imitations of liability and cargo valuations are inherent parts of the rates." *Id.* at 232. Thus, "[i]f a shipper in one state could hold a carrier to a higher standard or degree of liability than a shipper in another state who has paid the same rate, the first shipper would be getting a preference not granted to the second." *Id.* at 232–33.

Once deregulation took effect, the courts of appeals began to question whether a federal common-law claim against air carriers continued to exist. *See Sam L. Majors*, 117 F.3d at 928–29. The courts recognized that, because the rationale for creating the common-law claim was tied to Congress's regulatory goal, it was arguable that the courts

13

should have abandoned the claim once Congress abandoned the goal. *See id.* However, the Airline Deregulation Act included a savings clause that preserved common-law remedies. *Id.* at 928. The courts concluded that, in light of the savings clause, Congress intended that courts would continue to enforce the regulatory-era federal common-law cause of action against air carriers for lost or damaged shipments. *See id.* at 928–29; *see also Treiber & Straub*, 474 F.3d at 384 (collecting cases).

In short, the federal common-law claim against air carriers exists because it was created during the regulatory era and then saved by the deregulatory statute. *See Sam L. Majors*, 117 F.3d at 929 n.16 (stating that the federal common-law claim against air carriers is based on "the historical availability of this common law remedy, and the statutory preservation of the remedy"). But, as I previously explained, there never was a federal common-law claim against motor carriers in the regulatory era. Although pre-*Erie*, there was a general federal common law of common-carrier liability, that common law did not displace state common law, and in any event, it was abandoned after *Erie* was decided in 1938. Thus, by the time Congress deregulated the trucking industry, there was no federal common-law claim for damage during intrastate shipments that could have been preserved by a savings clause in the deregulatory statutes. Further, the statutes deregulating the trucking industry have not been interpreted to have created such a claim. To the contrary, the Supreme Court has found that the preemption provision of the Airline Deregulation Act, on which the preemption provision of the FAAAA was based, was not intended to "channel into federal courts" routine state-law claims "pursuant to judicially fashioned federal common law." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 232 (1995).

14

Because there is no federal common-law of intrastate shipping, R&J's contention that such common law completely preempts Asphalt's state-law claims must be rejected. Congress has not occupied the field of intrastate shipping, and therefore Asphalt's claims do not arise under federal law. As no other basis for federal jurisdiction has been asserted, Asphalt's motion to remand will be granted.

**B.    Motion to Dismiss**

Having found that I lack subject-matter jurisdiction and that the case must be remanded to state court, I do not consider R&J's motion to dismiss. However, I note that my conclusion as to complete preemption does not imply that R&J's express preemption defenses lack merit. Because the presence of a valid preemption defense does not create "arising under" jurisdiction, *see Vorhees*, 272 F.3d at 403, it will be for the state court on remand to determine whether the FAAAA preempts some or all of the plaintiff's claims.

**C.    Costs and Attorneys' Fees for Wrongful Removal**

Asphalt contends that it is entitled to recover "just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). A district court may award fees under § 1447(c) where the removing party lacked an objectively reasonable basis for seeking removal. *Jackson Cnty. Bank v. DuSablon*, 915 F.3d 422, 424 (7th Cir. 2019).

Here, although I have rejected R&J's argument for removal, I do not think the removal lacked a reasonable basis. The *Luccio* case and the cases recognizing federal common-law claims for damage to cargo against airlines provided reasonable support for R&J's position. Accordingly, Asphalt's request for costs and fees will be denied.

15

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Asphalt's motion to remand is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted insofar as the case will be remanded to state court. The request for costs and attorneys' fees is denied.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to the circuit court for Racine County, Wisconsin.

**FINALLY, IT IS ORDERED** that R&J's motion to dismiss the complaint is **DENIED** as **MOOT**.

Dated at Milwaukee, Wisconsin, this 5th day of April, 2021.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge